Good morning, your honor. May it please the court. My name is Gregory Fisher. I represent Cody Parenteau, his parents, and trial counsel, Gary Lassen, who's here with me. Cody's a little boy. He has autism. His parents filed an item. Are you going to be arguing both cases? Yes, your honor, I will be. Both the fees case and the merits? And the merits, yes, your honor. You didn't brief the merits case? The merits case I did not brief. We did recently enter an appearance in that, yes. I can't hear you. I'm sorry, your honor. I did enter an appearance in the merits case within the past month. But you're arguing both cases? I am, your honor, yes. Okay. His parents filed a claim under the IDEA to secure a free and appropriate public education. They lost. They lost twice over. Not only did they lose on the merits, but the district court concluded the case was frivolous and imposed judgment of one hundred forty thousand dollars, both on the parents and on trial counsel, Gary Lassen's opposition that this was never a frivolous case. It was a very complicated case with a lot of issues being argued and a lot of arguments that got raised. What I would like to do, subject to the court's permission and pleasure, is to briefly summarize two of the violations that we believe were overlooked or not addressed adequately. Then talk about the progress that did not occur and how that relates to the denial of the fape. And then, of course, talk about the fact that this was not a frivolous case. On the merits, there were at least two violations that simply just didn't... Just so we... Yes. Before we get into that, there is a statute of limitations issue as to one of the years, right? Yes. And the 2003-2004 year, it never really was briefed on the merits issue, and I think it's been waived at this point. So you're not... So we're now looking at 2005-2006. Exactly. 2004, 2005, 2005, 2006, those two school years. And, in fact, I'm going to be addressing the 2005... I was wondering, this may have been one of the worst briefs I've read in quite some time, not the one you filed, but the one on the merits. And I don't remember any discussion of the statute of limitations. You think that's gone now, right? Absolutely, that would be waived, Your Honor. If I may, on behalf of my colleague, Mr. Lassen, even he would recognize that the opening brief lacked some polish to it. This case has had a tremendous impact... It was horrible. Tremendous impact on his psyche. It was really, really terrible. Do you know why the brief is filed in this fuzzy format, for example? The opening brief on the merits? Yeah. I don't know that, Your Honor. Why your colleague didn't file the original copy rather than somehow getting the docket copy? I couldn't answer that, Your Honor, but you know what... Are you familiar with Rule 32 that requires the printing on briefs to be at least laser quality? I'm sure he's... Do you want to make it difficult for us to read and understand what the arguments that support his client's position? Certainly not, Your Honor. And he will file a conforming brief within a week of this? We will absolutely file a conformed brief that conforms to the court rules. I can't imagine how he managed to file a brief that looks like this, quite aside from the content, the service to the client. But go ahead. Thank you, Your Honor. If I may, please, here are the two violations. The first violation is that the teachers in the 2005-2006 school year were not qualified. Everybody agrees that you have to have... You seem to rest a lot of your argument on the fact that Cody's IEP team should have included an autism expert. Well... What's the legal authority for that? Can you give me any legal authority for that? Yes. The legal authority is on the composition of the IEP team, which... I guess I'm not finding that it didn't legally comply, so I want to know what... But you do continue to make the argument that the team should have included an autism expert. Yes, and, well, what I was going to argue was a related but somewhat different argument which pertained to the fact that the teachers themselves have to be qualified, which is a little bit different from the composition of the IEP team. But on the IEP team itself, Judge Callahan, the citation is the... In Section 1414D where it discusses the composition of the IEP team, you'll find a number of provisions in there that address the fact that there ought to be somebody on the IEP team who has the experience and ability to interpret the evaluation results, that there ought to be somebody who can supervise the educational services that are being provided, and also that there ought to be, if somebody requests, if either the school district or the parent requests, there ought to be an individual with sufficient background, experience, and knowledge in the disability at issue to ensure that the child's unique needs are met. Well, it did seem to be that the people did have those qualifications. What was deficient about their qualifications? Because I read what their qualifications were. Yes, and thank you. Let me turn my attention to that. I'm focusing primarily on the qualifications of the teachers. You have to have qualified teachers in order to provide a meaningful educational opportunity tailored to the child's unique needs. Even Judge Wake himself identified that in his order. What does that mean? The school district's expert was Joanne Phillips. She did not testify at the administrative hearing. She did testify at the bench trial. And what she testified was that in order for a teacher to be qualified to work with autistic children, that they would need a minimum of three to five days in seminar training, at a minimum. How does that relate here to the facts of this case? And by the way, that's at ER tab 14, pages 262 to 263. That was the second day of the bench trial. How does that relate here? In 2005 and 2006, the teacher was Christy Spangler. She had four hours of training, four hours. That's at ER tab 5 at 179. The one-on-one aid was Lillian Welliver for that same year, 2005, 2006. She had no training. No training, no experience, no background whatsoever. Not only that, but she had never even seen the IEP. She had no idea what the goals were that were specified for Cody. And yet she's the person who has primary responsibility for working with Cody to make sure that his IEP is being met. The lack of training itself, the lack of qualification is not a minor issue. The special education director was Nancy Martinez. She was the director of special education for the school district. She testified that her teachers were her experts. Those were her exact words. And that she gave them carte blanche to use whatever methods or methodologies that they chose. That's ER tab 13, pages 148, 149, also pages 144 and 161. I'm just trying to keep the record straight in this case, in my mind. There was a trial before the ALJ, right, the due process hearing? Yes. Okay. And much of this was not raised there. The quote, yes. How much of this was raised before the ALJ and how much of this was raised before the district court? The administrative law judge concluded, said that she had no jurisdiction to address the lack of training or the lack of qualification. That's at ER 8, the ALJ order, at page 11, paragraph 1. I think that's a somewhat stunning grip of the discretion that could have been exercised here because certainly the qualifications of the teacher would relate to whether or not an educational opportunity was being provided. But was the evidence presented before the ALJ? Oh, absolutely. In fact, Your Honor, the testimony that I cited here with Christy Spangler, the four hours, that was ER tab 5 at 179. The testimony on Lillian Welliver, that was presented at the administrative hearing, ER tab 5 at page 116 and 120. So that was exactly presented to the administrative law judge. The argument was made that, look, these people have inadequate qualifications to be working with this little boy to try to get him up to speed. And for whatever reason or reasons, the administrative law judge concluded that that was something that she didn't have the jurisdiction to even address. Did any of this have a consequence? Judge Fischer instructs us that if we look at another procedural violation, we can't just drop there. We have to ask the next question, which is, did it have a consequence here? Absolutely it did. Dr. Gentry testified that the school district personnel, it was obvious that they didn't have an adequate background or experience in terms of the methodologies that they were using to work with Cody. The test themselves, the objectively verifiable evidence confirmed that Cody regressed and that he made no progress. Christy Spangler. How do we deal with a situation like this? You had him before the L.J. Then there was a hearing before the district judge, right? Yes. Which additional evidence was admitted, which. Which is normal. Yes. The court can do, maybe should do, but certainly did do in this case. And then we have a decision by a district judge resolving some of these uncertainties in favor of the school district. I mean, you know, we weren't there. And how can we find fault with what ultimately we're reviewing what the district judge did in this case? How do we find fault with that? Implicating the standard of review, which is understood, and it's a clear error standard of review for the finding on the qualification. And Judge Wake did find here that the teachers were qualified, but he never addressed at all Joanne Phillips' testimony. In fact, he never addressed Dr. Gentry's testimony either. I think that absence itself. Does he have to address? I mean, isn't it enough if there are disputes and there's evidence supporting both points of view that he simply finds in favor of one party? Does he have to dispose? I mean, this is not an immigration case. We don't have sort of the Byzantine case law that we have in immigration cases where we fought I.J.'s for, you know, rightly or wrongly. But that's what we do for failing to address certain pieces of evidence. This is a district judge, life tenure and all that, you know. And normally we afford a great deal of deference to findings and discretionary decisions by district judges. What can you say here that suggests that Judge Wake here just completely got this wrong, that there's no support for his factual findings as abuse of discretion? Yes, it's absolutely understood that you want to accord a district court judge broad discretion. The clear error that would have occurred here rests in Joanne Phillips' testimony itself, the fact that it directly undercuts the basic concept of qualification. It's Joanne Phillips who's saying you need three to five days minimum before you can walk into that classroom and try to work with an autistic child. So why isn't that just a credibility resolution? The judge hears it all, hears one side saying the person's qualified, the other side saying, no, you need more. You know, why isn't that exactly the type of thing that would give some deference to the people that heard the witnesses? You know, for all I know, not having seen the witnesses, that this person that said that could have just come off as an absolute kook. You know, that's part of the reason we don't reevaluate, we don't reweigh the evidence. Well, and with respect to Judge Callahan, I don't believe it's a credibility issue as much as it is a pure admission by the district as to a basic standard that cuts to the fundamental aspect of has an educational opportunity been provided to meet Cody's unique needs. I need to spend some time on this attorney's piece. Yes. And your time's going. Yes, it is. So there was a question. Obviously, I think all of us on this Court have done a number of these types of cases. And, you know, honestly, I've ruled for the district sometimes, I've ruled for the parents sometimes, and so I don't come in with any idea that one person's right or wrong. Yes. And the process is one that we want parents to stick up for their kids. Yes. And having said that, I've seen instances where districters have not provided, you know, complied with FAPE, as it were. Of course we want parents to speak up, and we don't want them to live in fear of getting hit with $140,000. In fact, I don't ever think I've seen that kind of this sort of situation come up. So it makes me think from the standpoint that this judge obviously thought that your clients knew that they had nothing to do with wasting everyone's time. Tell me why I'm wrong about that. Well, yes. Because it's not – I've never seen this before. So I don't want a chilling effect on parents, but by the same token, we don't want people just using the courts when they know there's no remedy that is available to them, that they're just using it as a bully pulpit, as it were, to terrorize districts or something. And that's sort of what it seems the district court must have thought of your clients. Here's where this case got off track, is if you look at the initial scheduling conference, Judge Wake admits, I haven't done one of these before. What's the relief? What are you looking for? When the judge heard compensatory education, he apparently internalized the concept that you have to have some type of coin, which is natural. You hear compensatory, you think compensation, you think damages. And you see that same point coming up again and again and again throughout. It's like a frequent motif here. And, in fact, even in his orders, both on the merits and on the fees, Judge Wake concluded, even if the plaintiffs were able to prove a violation, they were not entitled to any remedy under the IDEA. That's wrong. That's wrong as a matter of law. In fact, if you look at Weisberg, the most recent decision from this court, 591 F3-1255, if you look at Park, 464 F3-1025, and if you look at Van Dyn, 502 F3-811, all of these cases were cited and discussed in our briefing. In all of those cases, the prevailing party, there was no question of damages being secured whatsoever, no question of, you know, an actual remedy so much at that time. What the question was, is has the IDEA been violated? If the IDEA has been violated, then the statute commands that the ---- But isn't that why parties have lawyers? I mean, God knows we've all been wrong in our initial take on a case. You know, this is why we're here in court, to hear and be educated. And, you know, I'll grant you that that may be a fair or reasonable assessment of what the district judge, the district judge's initial take on the case is. But it's the parents here, by the time they got to the district court, were represented by counsel. And isn't counsel's job to explain to the district court, if the counsel says the district court misunderstands the nature of the case, there are any number of ways in which counsel can set the court straight. And, you know, this is a district judge who spent a fair amount of time on the case, could have been educated if that was the problem, if that, in fact, was the issue. And it sounds to me like your colleague didn't manage to do that. Well, it's kind of like a prosecutor arguing for the death penalty on a charge where the death penalty is not available. All right. And the judge keeps saying, you can't get the death penalty on this. I don't want you to say that again, counsel. It sounds like the judge felt that counsel was arguing for something that counsel could never have. And mistakenly so, too. And here's why. Let's start at the beginning. Under the Act, when a due process complaint is filed, you don't even have to specify the relief if you don't know it, if it's not clear at the time. And it wasn't clear at this time. And the citation for that is Section 1415B7A Subdivision 4. Why is that? It's because of the context here. Many times parents and their counsel will not know precisely what relief is or is not available. You're dealing with disabled children. You're dealing with a situation that's dynamic, that's evolving over time. Were your clients prejudiced by the fact that they were asking for something to compensate for what they hadn't gotten and they never specifically asked? They couldn't come up with anything that they didn't get? Is that what the judge focused on? Mistakenly so, too. All right. And so what you're saying, if I understand your argument, is they were the law allowed them to ask for compensation. Absolutely. But the law didn't require them to say exactly what they want. Absolutely. Am I making your best argument? Absolutely, Judge Callahan. Thank you. All right. Much better than I made it. Well, no. Now, was the court – I saw something that we see things that all come through and everything, that one of the parents eventually had criminal problems out of misusing some funds. Was the judge influenced by that? I don't know. And, you know, my background is this. I had clerked for a district court judge, Judge Sedgwick in Alaska, and then for Judge Silberman in Phoenix. I'm a very loyal student of the court, and I would not want to believe that Judge Wake was influenced in that manner. Was it discussed at all? I don't – I saw no evidence of that in the record, and to my knowledge it was not discussed. It may have come up in some collateral other proceeding, you know, after the fact during judgment execution, but I don't believe it had anything prior to – and I wouldn't assume that that had happened here either. I did want to – I'm a little over my time here, and I recognize that – Let me get back to the point you were discussing with Judge Callahan. You said that when you bring a due process hearing, the complaint doesn't have to ask for relief. Now, that due process hearing is before the ALJ. Yes. But I thought by the time you get to district court, you have to be pretty specific, because at that point you are governed by the Federal Rules of Civil Procedure. Yes. Even in an ADA case – an IDA case, you are governed by the Federal Rules of Civil Procedure. Yes. We all live by them, right? Yes. So I'm not sure I fully understand your answer to Judge Callahan. Even if your client didn't need to specify relief by the time they got before the ALJ, why wasn't – weren't they required to be quite specific in what they were seeking when they were discussing – or when they filed the case, or at least when they – you know, there are many chances to amend the complaint, right? We allow fairly liberal amendment of pleadings. Why didn't they have the responsibility along the way to be quite specific in what they were seeking? Yes. And, in fact, they did, Judge Kuczynski. They proffered a number of different available options for the district court judge. One of them was remedial education based upon the one-on-one method. That's a very common method. And, in fact, this court and parents of student W. P. Wallop School District commented on it a little bit, instructed that it's not a default standard. It's not mandatory. Of course, the district judge does not have to apply that. But it is, as a matter of course, a very common standard that is, in fact, implied. And how does that – So your answer to my question, just to compress it, is you believe your clients did do that in the district court? Yes. But if I may, please, there were some additional options or types of relief that they presented beyond the one-on-one. Now, the district court judge could reject that. That would not be a problem. But it wouldn't make it frivolous asking for it. They also suggested, what about additional training beyond what they've already received? And trial counsel Gary Lassen pointed out that these guys who are in Prescott – I don't know if you're familiar with Arizona, but that's a little bit of a leg drive. I lived there for three years, and I would go up to Prescott in the summer when it got too hot. So it's not real close. And what he pointed out was that, hey, why don't – if they got some additional training, they wouldn't have this long-distance situation. They'd be able to exercise better-informed discretion. And Judge Wake commented that in his order, but seemed to believe, as I read his order, that he didn't have the power or the authority, even if he had found a violation, that he didn't have the power or authority to do anything. Another option – so there were two remedial options that were identified. Ray Parenteau – When I spoke about training there, you were not talking about training the child. You were talking about training the teacher. Yes. Just to make sure – Yes, I'm sorry. Yes. Same page. And that's Park. That's exactly Park. Because in Park, the parents asked for remedial education, and the district court said, you know what, I don't think you get that here, but I'm going to do something different. I'm going to order additional training for the teachers. And that was affirmed on appeal. And that's an example of the type of discretion that Article 3a does. So you are over your time. Yes. So your position is that this was fairly presented to the district court. I'm sorry, Judge. The remedial options were fairly presented to the district court. Yes. Now, if the court concluded insufficient evidence, that's a different issue, but it doesn't make it frivolous. Also, trial counsel had suggested the option of why not a remand to the ALJ. And that's another very common option that comes up in these cases where, again, you've got a dynamic evolving process over a number of years. Thank you. Yes. With your permission, Chief, can I ask? Yes. Hypothetically, if you were to lose on the faith issue, but you were to prevail on the attorney's issue, it's my understanding that you're asking for attorney's fees on appeal. We're not entitled. That seemed like 100 pounds of chutzpah to me. We're not entitled to fees. We have to show a violation. And there were two violations here, minimum, the qualification of the teachers and the IEP was never. All right. But if you lose on the faith, but you win on the attorney's fees, you're not entitled to attorney's fees on this? That's correct. All right. That's all was my question. Judge, may I beg the Court 10 seconds to just summarize the second violation, the IEP violation, the fact that the IEP itself was never followed? It specified that Cody was supposed to have a one-on-one instruction in a small group setting. The record in the briefing that we've identified clearly shows that that was not the case, that the class sizes were over large, but that the one-on-one instructor didn't even have any training whatsoever. How can he be getting effective one-on-one training? Robert Tan. Yes. Thank you. Thank you very much. We'll hear from the school district. Good morning. Good morning, Your Honors. Good morning. Rachel Love and Eileen Gilbride on behalf of the Prescott Unified School District and Superintendent Kevin Kapp. I would like to frame my argument focusing on two issues. First, I want to address the IDEA issue and whether or not FAPE was denied, and then I'll move to the attorney's fees issue. To start off, counsel for the plaintiffs told you that, in his view, the big violations here are qualifications of the teacher, and he also spoke about an autism expert being on the IEP team. First, I'd like to address whether or not an expert. The problem, of course, is that the child regressed for a long time. His IQ went down. He spent two or three years in school. I mean, some of them are now past the statute of limitations, but where things were going on but nothing very effective, he was essentially either stayed in place or got worse. Maybe the school district was in good faith, but it looked to me like they were wholly ineffective, and being wholly ineffective is not what the mandate is under the IDEA. The mandate is to give a free, appropriate education, appropriate meaning that you actually have continuing progress. And the problem here is it looks to me like until they really got serious and the parents got really insistent, the school district didn't do anything very much effective. That's what the case looks like. Your Honor, at the administrative hearing level, Ms. Sonia D. Christina, she was the school psychologist, and she addressed the issue of whether the test scores showed that he was regressing. The only test that was administered both in 2003 and 2006 within the appropriate period to reevaluate was the Vinland adaptive behavior test. Ms. D. Christina, the school psychologist testified that the reason that the 2006 test results showed that the child was not doing well at all was because the test that was administered, the only one that was administered both times, tests based upon how is this child doing as compared to other 8-year-olds. And that's fine, and they explained that away, but then if that's what it looks like, why didn't they give him another test then to see if he really was regressing? Well, the — I mean, assessment of the child is part of the school's responsibility. If you gave him the wrong test, then shame on you, and I don't mean you personally, I mean your client. And they need to try again and give him the right test. Well, Your Honor, it's about — it's not only about the test. I think what the bigger issue here to look at is the progress. You chose to talk about the test, so we're going to talk about the test. So saying — I mean, what Judge Callahan is saying, which I agree with, is that the fact that they gave him the wrong test doesn't really meet the school district's — doesn't show the school district's — And I'm not saying that he — the wrong test was given. I was trying to explain what the test results are. Well, I think you did say — I think you did say that. You said the test — I think what you were saying was the test doesn't really mean he's not making progress. Right. It means that he's not making progress. So it has to show that he still should be making progress, right? He should still be making progress. He still should be making progress, and the IEPs and the progress reports show that he was. What do you have to show that? I'm sorry? What do you have to show that he was making progress? We have the test — or, I'm sorry, the progress reports under the IEPs for each of the years, which are at Excerpt 5, Tab 10 through 16. And these are the progress reports and also the IEPs for each of the years at issue. At the end of — quarterly progress reports were provided. Excerpt what? Excerpt 15, Tab 10 through Tab 16 show the IEPs and the progress reports. You know, I see appellant excerpts are right here. They have little numbers at the bottom. Are these your excerpts? These are the appellant's excerpts. They have little numbers at the bottom, little base numbers. Can you give me a base number? No, that's okay. She can do it. I mean, you're reading from something, right? Yes, I'm reading from my notes. But the excerpts that I'm speaking of are — Do you want Mr. Fisher to help you? Yes. Why don't you go ahead and help her? The point I was going to qualify, Your Honor, is that I had filed the excerpt on the seizure appeal with the base stamps numbers on them. The base stamps numbers that my colleague is referring to are the ones that were filed by Mitchell Lassner on the marriage appeal before my involvement. And those are the ones with the tabs. So Tab 15 exhibits 10 to 15 are the IEPs and the progress reports that she's referring to. More file lawyering on your colleague's part, huh? Okay. So is this Exhibit 15? Yes. Okay. And then within Exhibit 15 — Within — I'm sorry? Within Exhibit 15, there are then tabs. And I'm looking at Tabs 10 through 16. Okay. Let's start with 10. It would be easier to start with Tab 11. That's Tab 11. Okay. 11 it is. Tab 11. So what are we looking at here? Tab 11 is the progress reports for the fourth quarter. In this case, the evidence — For which fourth quarter? For the 2003-2004 school year. That's the one that's outside the statute of limitations? Yes, but the Court took into evidence what his progress was before so that we could see if there was progress — You can't have it both ways. You can't say it's outside the statute of limitations. Okay. Well, then we can start — We can't allow progress during that period. We better talk about the period that's now issued. Okay. Well, then we can look at Tab 13. Okay. 13 it is. Okay. Tab 13 is the fourth quarter report for the 2004-2005 — This is period four? Yes. 2004-2005 school year. Okay. And — 10-4-2005, is that what it is? Yes. Okay. Yes. Go ahead. And in the column under period four, there is a coding system, whereas the school teachers found, based upon Cody's progress throughout that year, that Cody had exceeded three of his goals, had met seven, and was approaching compliance on two. Then if we look down to Tab 16 — Okay. So A means exceeding, B means meets, and C means approaching, right? Yes. And the code is at the bottom of each page. Right. So — And these are his progress — A2. The first A I see is on page — So we're looking for A's and B's, right? Yes. Okay. So these were progress reports by the teachers? Yes. Based upon the observations of the teachers and of the therapist as to whether or not — Did the parents sign off on this? These were provided to the parents. And Nancy Martinez testified at trial, or before the district court, that she did not receive any notification from Mr. Parenteau or Ms. Parenteau that the Parenteaus were unhappy with the progress that Cody was making until the 2006-2007 school year. So based upon these tabs that I noted for the record, each one of them shows that Cody was making progress. Now, was he making the same progress as an 8-year-old who is not disabled? No. We don't dispute that. But he was still making meaningful progress towards all of his goals. I would like now to turn to — Well, let's take — This is — Let's figure out which page. SL3-8. Improves effective speaking, listening by increasing word knowledge skills. Okay. Are we still on tab 13? 13, yes. Okay. And you're at which page? So just so I understand this, it's about three pages down. Four pages down? It's goal SL3-8. Improve effective speaking, listening by increasing word knowledge skills. Yes. And he gets an A1. Yes. So he exceeded the expected — The 1 means — refers to a particular teacher. I'm sorry? The A1 means that he exceeded the expected progress with sufficient progress to achieve the goal within a one-year period. And the designations of the 1 and 2 code are on your bottom right. Okay. Now, this sounds to me like he, during this period, during this quarter, he got — was better able to talk or better able to listen or something of that sort. Other than — what is a document? What exactly does he — what the progress was, other than somebody's assessment? Well, this is an assessment of the teachers by what the goals were, which was to improve his effective communication. We don't have specific examples, but this is based upon the observations of the teachers over the year. Now, if you turn a couple pages down from where you're at right now, there is a narrative section for each period where there is further anecdotal evidence. The IDEA does not require that the teachers submit specific day-to-day evidence of what the child was doing. It's based upon what the teacher has seen over the course of the year or, in this case, over the course of the quarter. So it's our submission that the child did make measurable progress. The IDEA does not set forth particular levels of performance or levels of progress because each child is unique, and that's what the IDEA contemplates, is that each child is unique and their needs are also unique. I'd like to turn now to the argument — Counsel, before you do that, I don't understand the chronology here. It's not totally clear in the record to me. One of the concerns from the petitioner's side is that the team wasn't qualified. Can you tell me who the special ed teachers were for these three years that taught Cody and what their qualifications were? Yes. They're Ms. Harlow, Ms. Froschel, and Mrs. Springer — Springle. And all three teachers had degrees, and their qualifications are set forth in the administrative record in their testimony. All three were special education teachers. They all had degrees in special education. Mrs. Springle also had a — she had a double degree in special education and also in elementary education. The first two teachers, Harlow and Froschel, were certified in Arizona as special education teachers. In Arizona, there is no — as compared to California, there's not an autism certificate. It's a cross-categorical special education. Ms. Springle, who was the last teacher for 05-06, she had a provisional certificate, and it was only because she lacked the — that she hadn't taken the Arizona constitutional or the federal constitutional law test that is part of the certification. So all of the teachers were appropriately certified and qualified. And, in fact, Dr. Gentry testified at trial that he did not have any opinion on whether or not the teachers were qualified because he didn't even know what their qualifications were. All right. One other question. Yes. Ms. Reeves, the school district refers to one-on-one aids. Does that mean that Cody was being provided an aid in a special ed class that was assigned specifically to him at all times? Yes. Cody was in the cross-categorical class called the BEST program, and the BEST program was a classroom where there were children with autism, mental retardation, and other disabilities. Cody was provided with a one-on-one aid. Now, that does not mean that he had necessarily the exact same aid each day. And perhaps there may have been times, the record is not clear, there may have been times where there could have been days where he shared an aid with another student. But he was provided with a one-on-one aid throughout the course of the time period at issue, and even following, as it is now, and the testimony came through at trial, that he has two aids assigned to him at this point. So starting 2004, I mean, maybe before that, but throughout the trial period that is within the statute of limitations, he had a one-on-one aid? Yes, he did. Now, and the aids did testify at the administrative proceeding, and Ms. Welliver is one of them that testified. She was the one that counsel pointed out that she may not have known what his IEP goals were or what, even saw his IEP, but she did testify that Ms. Springle, the special education teacher, met with her every day, told her what the objectives were, told her what the child needed to be learning and what they needed to be concentrating on. So we're not talking about a situation where an aid is just left to decide, well, what am I going to do with this child this day? There was objectives that were communicated to the child. Do you want to speak, spend some time speaking about the attorney's fee award? Yes, Your Honor. There's no dispute that they were entitled, I mean, not whether they were entitled in this case, but as a theoretical matter, one can be happy with the current services the child is getting, but you could have a claim in the past they didn't, he didn't get the right services, and we want compensatory education, which is sort of additional sort of catch-up education. That kind of claim is not inherently frivolous. Yes, you're right, Your Honor, and we do not contend that it is, and we don't even contend that the original due process proceedings were frivolous by any means. What the argument is is that the claim was, once we get to the district court level, the claim was without foundation from the beginning, and the reason for that is at the time that the lawsuit was filed, Mr. Parenteau and Ms. Parenteau knew that they did not have any out-of-pocket expenses such that reimbursement, and we're not, I don't think anybody's arguing that they were entitled to reimbursement. But as the... They were seeking, I mean, inartfully perhaps, but it's pretty clear what they were seeking were, I mean, they call it compensatory education, but it's really sort of catch-up education. It's like... Right. The student didn't get, I mean, I guess the analogy would be somebody gets to fourth grade, and let's say they're not a disabled student, but they didn't get math training, so they could send them to summer school or bring a tutor in math or something. Right. Just like a regular kid. If they're behind in a class, you get them a tutor. Exactly. And so if the court would have found that he hadn't gotten everything that he needed and said, this is how we're going to make it up, but the judge, the district judge seemed to fault them for not being able to say specifically what they wanted, and I'm wondering how that, you know, a frivolous is a tough rock to push uphill. And it's not a question of what they, that they didn't exactly say what they wanted. But what is at issue here is that whether they wanted tutoring, whether they wanted additional personnel, whether they wanted additional training, they wanted after school services, there was no evidence to support that the child needed that. So what they asked for was never supported by any evidence that they were ever going to have. They had Dr. Gentry on board. Dr. Gentry actually started providing services to the school in 07 at the request of the parent hose and the school district agreed to allow them. But their own expert never had any testimony, never had an opinion that this child needs additional services beyond what I can provide. Can't you as a parent, though, even you know your child, can't you as a parent say, you know, there's actually kids that their parents do other things than what the school provides and they do a whole lot better than what the school districts do with them. You know, that's, I mean, the school districts don't necessarily have the corner on doing the best in this area. And so, I mean, can't they just as an advocate for their child say, you know, I need more. This just isn't working. I don't care what, I don't care what anyone says. This child just, you know, I believe this child can do better and it's not doing better. And then you get hit with $140,000. But there's a difference between that and having the evidence to support that this child needs these kinds of services. And here we didn't have any evidence that the child needed additional services, whatever form that they might be in. We did have an expert that seemed to say the child did. The expert, Dr. Gentry, never testified that the child needed any additional services. And, in fact, the expert. He testified what he thought were deficiencies. Yes. But he also testified that the services that he was providing and that Carrie Burgess was providing was resulting in the child making incredible leaps and gains. And we have to also go back to the fact that here there was no fate violation. You say that's a but, but I don't know why that's a but. The child could be getting fine services now. He could be progressing well. And that's not at all consistent with saying he has deficiencies in the past that could be corrected by additional services to make up for, you know, just like a non-disabled kid who had a bad math teacher. And so you bring. As the court found, as the Ninth Circuit found in the 2006 case of Park v. Anaheim Union School District, while the courts are permitted to award compensatory education if there's first a violation of fate and a violation of the IDEA, the court cannot speculate as to what services should be provided to the child. There needs to be some evidence as to what the child needs so that the court can formulate what services that the child might need. Is your best argument that this is frivolous, that at the district court level they should have put on expert testimony saying what would have been compensatory? That they needed such evidence. And at the time that they filed the complaint, they already knew that the services that were being provided by Dr. Gentry and Carrie Burgess were providing what Mr. Parenteau himself testified to at trial was ecstatic. They were ecstatic with the services that were provided and the progress that he was making. All right. So any evidence that you can point to that they were doing this out of a black heart and to harass the school district? And or is it just that they didn't present an expert? Their evidence was deficient. Their evidence was deficient. And the court found that the improper purpose did lie in the fact, and Judge Wake was the one who heard the evidence at trial, was that the Parenteau's continued on with this lawsuit knowing that they had no evidence, no experts that was going to say that this child needed any sort of specific services, whether it was additional training of the teachers, whether it was services for Cody, and that they continued on time and time again in the face of warnings by not only the court, by our defenses, that there was no such evidence that was ever going to entitle them to compensatory education under the IDEA. Thank you. Thank you. Mr. Fisher, you've taken more than your time. If you'd like a minute for rebuttal. Thank you, Your Honor. I think I can be more brief than that. I just wanted to give the court four citations. It only has 60 seconds. On the progress issue, Christy Spangler, ER tab 5 at 185, she testified that Cody progressed, but then she said, well, he regressed too. Amber Fornara, she was a teacher with the district, ER tab 5 at 191 to 193. She testified that Cody was among the most severe of their students, that he just never seemed to get anywhere. The IEP narratives, please do look at those. I was going to ask you, is the IEP narrative there?  but I think the IEP narrative and the ER tab 15 exhibits 10 through 15, they're almost identical. I mean, if you look at it, if you actually read the ‑‑ Mr. Fisher? Yes? I have looked at them. Yes. And I can see where a parent might get any of these things object. Problem is, your client didn't object. And, you know, the way the IEP process works, as I understand it, is the IEP is put into place, it gets implemented by the school, so various people, and I say people, some of them are teachers, some of them are aides, some of them are other kinds of professionals, I call them all people, human beings go ahead and implement it, and then they put reports in. And if I understand it correctly, and correct me if I'm wrong, if the parents are not satisfied, if they believe that what these people are saying is not an accurate reflection or not a fair reflection or not an adequate progress, they're supposed to object. They're supposed to come in and say, hey, you know, this is wrong. They say he's got an A, he's not an A, he's a C, you know, whatever, right? I mean, they have that process open to them, and they didn't do that until very late in the process. Are they bound by these assessments? Well, two things. One, they didn't object because they're relying upon the experts who are the school district. No, no, I understand there are reasons why they didn't object, and I sympathize with those reasons, parents that are not trained in the law and all that. But the fact of the matter is they didn't object. That's right, Your Honor. And as a legal consequence of not having objected, understandable as it may be or sympathetic as it might want to be, why aren't they, are they not bound by it as a matter of law? You know, they, to some extent, I mean, the school is relying on the parents to say, you're not doing, you know, to object, and so they can go back and correct the process. If they have these reports, and the reports say everything is hunky-dory, the parents who, of course, see the child half the time, I mean, more or less, half the day he's at school and half the day he's at home, so they have as much access to the child as the school does, and if they concur, essentially, by not objecting, the school doesn't have any reason or any basis for making changes. I mean, everything is fine, right? The primary point I was trying to make, Your Honor, was the fact that when the school district says he's making all this progress, if you look at the IEP narratives themselves, they really seem to suggest that he's kind of flat-lined, which, in fact, was what their expert, Joanne Phillips, kind of confirmed as well. ER Tab 15, Exhibit 38, Trial Exhibit 38. Please look at pages 4, 5, 7, and 8 of Joanne Phillips' opinion, and you'll see that she frequently makes comments about the fact that he's kind of flat-lined. He doesn't seem to be getting anywhere. So these are their people. These are their estimates. The last point I wanted to make was certification is not synonymous with qualification. The district has talked about the fact that these teachers were certified. Yes, they were certified. That doesn't mean that they were qualified to work with autistic children. I think we've understood that point. Has there been any effort in this case to try to mediate a solution? We, I myself, have actively attempted to settle the case unsuccessfully. Well, you all have heard our questions and our argument. I think we've asked questions that should concern both sides. Absolutely. And it's a difficult case. And ultimately what I think we all need to keep in mind that this is about the little boy and his welfare and that nobody's interest is served by having continuous strife between the parents and the school district. We have a very fine mediation office here, right in the building. They do exceptionally fine work. And I was wondering if counsel would be willing to make one last effort to resolve the case. I would welcome that opportunity, Your Honor, and I would invite my colleagues to accept it as well. And we're under the auspices of our mediation office. And we could defer submission. And if they were interested in doing that for, let's say, a two-week period, and I assume my colleagues would be amenable to something like that. But let's hear whether there's an interest in the school district's part. Your Honor, I would like to confer with our clients to see whether or not they have interest. Okay. Well, we'll defer submission for 48 hours. And if the parties are interested in mediating, they should each file a statement to that effect. And we will defer submission further. If not, we'll hold the case submitted and decide it. Judge, thank the Court for its time and attention this morning. We would ask that it reverse and vacate the judgment of fees. This was never a frivolous case. Thank you. Okay. Thank you. We'll thank you for the argument. We'll defer submission in this case for 48 hours to hear from counsel.
judges: Martinez, Kozinski, Callahan